**FILED**

MAY 2 9 2014

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                        DEPUTY

UNITED STATES DISTRIC COURT
FOR THE WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MATTHEW L. BISSANTI, JR., | CIVIL ACTION NO.: |
| Plaintiff/Relator, | **A14 CV0 4975S** |
|  | COMPLAINT: |
| v. | For damages and other relief under the False Claims Act |
| DANIEL SCOTT GOLDMAN; DANIEL S. GOLDMAN REVOCABLE TRUST; JENNIFER GOLDMAN REVOCABLE TRUST; FLYWHEEL GROUP LLC; OMNI SCM, LLC; ECOLOGIC INDUSTRIES LLC (DBA ECOLOGIC FURNITURE); BON SOURCE INTERNATIONAL, LLC; KEN KLEIN; ANDREW HOLLEY; RON JOHNSON; R.L. SWEARER COMPANY, INC.; RICHARD SHADLEY | **FILED UNDER SEAL** **PURSUANT TO** **31 U.S.C. § 3730(b)(2)** **DO NOT ENTER UNDER PACER DO NOT PLACE IN PRESS BOX** |
| Defendants. |  |

## RELATOR'S ORIGINAL COMPLANT

1.  Relator in this action is Matthew L. Bissanti, Jr. (hereinafter "Relator"), who resides at 1604 Shady Creek Trail, Cedar Park, Travis County, Texas 78613, brings this action for himself and for the United States of America to recover damages, civil penalties, and other relief pursuant to 31 U.S.C. § 3730(b), *et seq.*, the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3733, by virtue of Defendants' systematic and currently ongoing conspiracy to make and use knowing misrepresentations and other false acts calculated to evade owing and to deprive the United States of revenue.

2.  This court has jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

3.  This court has venue, pursuant to 31 U.S.C. § 3732(a), as Defendant Omni SCM, LLC, used

Relator's Travis County, Texas, home address (1604 Shady Creek Trail, Cedar Park, Travis

County, Texas 78613) when it registered as Importer of Record with United States Customs

and Border Protection (hereinafter "Customs"), when it applied for and obtained a customs

bond required to secure the United States respecting the payment of revenue and fulfillment

of importer entry compliance obligations, and so used it in connection with multiple

importations into the United States, and because other business transactions or other acts in

furtherance of the conspiracy described herein were committed in Travis County, Texas.

## I.    INTRODUCTION

4.  This action arises from Defendants' conduct in knowingly evading, causing others to evade,

or conspiring to evade antidumping duties and other customs duties owed to the United

States on imported goods subject to *Final Determination of Sales at Less than Fair Value:*

*Wooden Bedroom Furniture from the People's Republic of China:* Antidumping Duty Order

in United States Department of Commerce, International Trade Administration Case Number

A-570-890, 69 Fed. Reg. 67,313 (Nov. 17, 2004) (hereinafter "AD Order") and subject to

antidumping duties at the "PRC-Wide Rate" of 216.01 percent.

5.  The importations by or for the benefit of one or more Defendants complained of herein,

wherein in antidumping duties and other customs duties owed to the United States on

imported goods were avoided or underpaid, began as early as 2011, are continuing at the

present time, and are expected to continue in the near future.

6.  Relator alleges and discloses that Defendants systematically, routinely, and on many

occasions, knowingly and artfully:

a. misrepresented, caused to be misrepresented, or conspired to cause or arrange to misrepresent to Customs the correct description of imported goods [*e.g.,* wooden bedroom furniture from PRC] via a parallel invoicing scheme and or,

b. created, caused to be created, solicited, used, or arranged for others to use false or misleading documents; and/or,

c. engaged in false practices, made or caused to be made, solicited, used, or arranged for others to make false assertions or intentionally omit appropriate descriptive information on Purchase Orders, Pro Forma Invoices, Commercial Invoices, in email and fax communications, packing lists, Bills of Lading, Importer Security Filings, Customs entry documents, *etc*; and/or,

d. failed to declare, caused others to fail to declare, or otherwise conspired to avoid declaring or disclosing to Customs on each import entry summary (CBP Form 7501) that imported goods were or may be subject to antidumping duties by, among other acts and omissions, not declaring entries as "Type 03" in Field 2, by misclassifying goods under the Harmonized Tariff Schedules the United States (HTSUS) in Field 29, omitting reference to the applicable antidumping case number in Field 29B, thus avoiding revealing the existence of an applicable AD Order at the time of entry; and/or,

e. failed to declare, caused others to fail to declare, or otherwise conspired to avoid declaring or disclosing to Customs on each import entry summary (CBP Form 7501) that antidumping duty amounts on imported goods were properly assessed and reported in Fields 34 through 40, thus avoiding payment of all applicable duties; and or,

3

   f.   failed to disclose, caused others to fail to disclose, or otherwise conspired to avoid disclosing to Customs in connection with the liquidation of each import entry summary (CBP Form 7501) that antidumping duties on imported goods were underpaid; and/or

   g.   by these false practices, deprived Customs of essential information by which Customs could have specified an adequate Customs bond sufficient to protect the revenue of the United States.

## II.    PARTIES

7.  **Relator, Matthew L. Bissanti, Jr.,** was previously described as President and Director of Defendant Omni SCM, LLC, during periods where he associated with Omni SCM, LLC, as an independent contractor and also during a brief period of employment in 2014, and was similarly described in connection with his association with and/or employment by predecessor firm and Defendant Bon Source International, LLC.  He is a U.S. citizen and a resident of Cedar Park, Texas, with address at 1604 Shady Creek Trail, Cedar Park, Travis County, Texas 78613.  During and throughout his association with Defendants, he became directly familiar with, obtained personal knowledge of facts and circumstances, and observed and possessed documents establishing violations of law disclosed within the Complaint.  In fact, Omni SCM, LLC, has conceded that Relator, though "not a 'partner,'" "had intimate and unparalleled knowledge regarding Omni's business, operations, strategies, customers, and deals."  Relator formally resigned from his brief employment with Omni on April 14, 2014.  Relator is the original source of facts and information hereinafter set forth concerning the activities of the various defendants.  Relator is unaware of any judicial or administrative

process or public disclosure which might bar him from recovery pursuant to the instant action.

8. **Defendant Daniel Scott Goldman** ("Goldman"), is a citizen and resident of Evergreen, Colorado.  Goldman is the managing member of the Flywheel Group, LLC, a limited liability company organized under the laws of the state of Illinois, with its principal place of business in Waukegan, Illinois. Defendant Flywheel Group, LLC, owns or has an ownership interest in a number of entities, including Defendant Ecologic Industries, LLC, where he serves as Chief Executive Officer.  Goldman was and is actively involved in the day-to-day operations of Defendant Ecologic Industries, LLC.  Goldman is the beneficiary of the Jennifer Goldman Revocable Trust, which co-owns Defendant Omni SCM, LLC, with the Daniel S. Goldman Revocable Trust.  Goldman was and is actively involved in the day-to-day operations of Defendant Omni SCM, LLC, and has claimed to be its "Managing Member."

9. **Defendant Daniel S. Goldman Revocable Trust** co-owns Defendant Omni SCM, LLC, with the Jennifer M. Goldman Revocable Trust, though Daniel S. Goldman has represented himself as the "Managing Member."  Daniel S. Goldman and Jennifer M. Goldman are co-trustees of the Daniel S. Goldman Revocable Trust.  Jennifer M. Goldman is the beneficiary of the Daniel S. Goldman Revocable Trust.

10. **Defendant Jennifer M. Goldman Revocable Trust** co-owns Defendant Omni SCM, LLC, with the Daniel S. Goldman Revocable Trust.  Daniel S. Goldman and Jennifer M. Goldman are co-trustees of both trusts.  Daniel S. Goldman is the beneficiary of the Jennifer M. Goldman Revocable Trust.

11. **Defendant Omni SCM, LLC** (hereinafter "Omni"), a limited liability company organized under the laws of the state of Delaware, was incorporated on or about December 21, 2012.

Omni describes itself as a "global leader in supply chain procurement strategies" [that] "collaborates with its clients in a broad range of industries to design and implement innovative sourcing strategies to enhance client's operational performance and to provide clients with global competitive advantages in their respective markets." Omni reports that it "has a global infrastructure, with offices and agents throughout North America, including Golden (CO), Austin, Chicago, and Toronto, four offices in China, and offices in Taiwan, Korea, Vietnam, Bangladesh, and Thailand." Omni's two members are the Daniel S. Goldman Revocable Trust and the Jennifer M. Goldman Revocable Trust. Generally speaking, Omni provides myriad foreign sourcing and supply chain management services to domestic companies desiring to procure foreign merchandise. Its services typically include communicating with domestic clients respecting the details of the foreign merchandise, identifying potential foreign producers, assisting domestic clients negotiate production agreements with foreign producers, establishing relationships with foreign agents, communicating production, delivery, and payment details. For its services, Omni charges a commission based on a percentage of the value of the foreign-sourced merchandise. Omni also acts as Importer of Record for certain domestic customers, including Defendant Ecologic Industries, LLC. Omni currently reports that its principal place of business is in Golden, Colorado, though it has acted on many occasions and continues to act as Importer of Record respecting importations of foreign merchandise entered into the United States using the home address of Relator (1604 Shady Creek Trail, Cedar Park, Travis County, Texas 78613. Omni acted and continues to act as Importer of Record respecting importations of foreign merchandise owned by Ecologic Industries, LLC, wherein Omni had(has) no financial interest or was(is) otherwise ineligible to act as Importer of Record. Omni has

obtained and continues to act as Importer of Record using a customs entry bond associated

with Relator's home address (1604 Shady Creek Trail, Cedar Park, Travis County, Texas

78613).

12. **Defendant Ecologic Industries LLC** DBA Ecologic Furniture ("Ecologic") is a limited

liability company organized under the laws of the state of Illinois, with its principal place of

business in Waukegan, Illinois.  The managing member is Flywheel Group, LLC, a venture

capital and private equity company owned by Daniel Scott Goldman.  Ecologic

(www.ecologicfurniture.com) primarily markets and sells wooden bedroom sets and

dormitory furniture sets for on-campus and off-campus student housing.  Furniture marketed

and sold includes bedroom sets comprised of student beds, student desks, dressers,

wardrobes, chests, storage units, student lounge furnishings, chairs, tables, nightstands, *etc.*

Ecologic markets its offerings as more ecological, more sustainable, and more "green" than

competing offerings.  By and through the actions of Daniel S. Goldman and others, Ecologic

was involved in the day-to-day decisions and operations respecting the foreign sourcing,

delivery, and importation respecting certain goods imported by Defendant Bon Source

International, LLC, and respecting certain similar goods imported (and to be imported) by

Defendant Omni and had exclusive financial interest regarding the same at the time of

importation into the United States.

13. **Defendant Flywheel Group LLC** (hereinafter "Flywheel Group"), is a limited liability

company organized under the laws of the state of Illinois, with its principal office in

Waukegan, Illinois (same physical address as Ecologic) owns Ecologic.  The Flywheel

Group is a venture capital and private equity company owned by Daniel S. Goldman.

14. **Defendant Ken Klein ("Klein")** is an employee of Ecologic and is(was) President. He is a resident of Illinois.

15. **Defendant Andrew Holley ("Holley")** is the Senior Vice President of Omni and Senior Vice President of Ecologic. He is a resident of Colorado.

16. **Defendant Ron Johnson** is the Distribution Manager of Ecologic. He is a resident of Illinois.

17. **Defendant Bon Source International, LLC**, a division of Bon Tool Company, was(is) a limited liability company organized under the laws of the state of Pennsylvania, with its principal place of business in Gibsonia, Pennsylvania. From January 2010 to December 2012, Relator served as actual or nominal President and/or Director of Bon Source International. Similar to Omni, Bon Source provided myriad foreign sourcing and supply chain management services to domestic companies desiring to procure foreign merchandise. Its services typically included communicating with domestic clients respecting the details of the foreign merchandise, identifying potential foreign producers, assisting domestic clients negotiate production agreements with foreign producers, establishing relationships with foreign agents, communicating production, delivery, and payment details. For its services, Bon Source charged a commission based on a percentage of the value of the foreign-sourced merchandise. Bon Source also acted as Importer of Record for certain domestic customers, including Defendant Ecologic on several occasions, wherein Bon Source had no financial interest or was otherwise ineligible to act as Importer of Record. Incidental to Omni's creation on or about January 1, 2013, Omni acquired certain assets of Bon Source's supply chain management business.

8

18. **Defendant R.L. Swearer Company, Inc. ("R.L. Swearer")**, is a Pennsylvania Corporation with its principal place of business in Moon Township, Pennsylvania. R.L. Swearer is a customs broker licensed by Customs. A licensed customs broker is authorized to conduct customs business and is deemed to be an expert respecting compliance with the laws governing the importation of goods into the United States. R.L. Swearer is also a freight forwarder licensed by the United States Federal Maritime Commission (hereinafter "FMC"). R.L. Swearer served as a customs broker for Defendants Bon Source and Omni. In that role, R.L. Swearer filed numerous import entries on behalf of Defendants. Each time R.L. Swearer filed an entry for a Defendant, it extracted information from import documents and caused that information to be transmitted electronically or provided in hardcopy to Customs. In its filings to Customs in connection with import entries filed as agent for Defendants, R.L. Swearer provided or omitted providing certain responses derived or derivable from the import documentation. R.L. Swearer acted as agent and attorney-in-fact for Defendants, in connection with import transactions, and counseled, or was obligated in the circumstances to counsel, Defendants respecting compliance with United States import laws, including the right to make entry, proper description and tariff classification of imported merchandise, and respecting compliance with United States laws imposing additional duties (*e.g.,* antidumping and countervailing duties) on certain classes of imported merchandise, *etc.*, and to exercise responsible supervision over employees in connection with same.

19. **Defendant Richard Shadley** has been employed by R.L. Swearer since July 2002, where he has held the position of Import Account Manager and where he has been designated as an Importer Security Filing (hereinafter "ISF") Coordinator since November 2009. He has held

the status as a Certified Customs Specialist (hereinafter "CCS") before the National Brokers

and Forwarders Association of America (hereinafter "NCBFAA") since January 2010.

### III.   ALLEGATIONS

**A. Assessing Customs Duties and Import Requirements**

20. Importers availing themselves of access to the U.S. commercial market must pay the United

States duties on goods imported into the United States. 19 U.S.C. § 1505;

19 C.F.R. § 141.1(b).

21. In addition to regular customs duties, the United States may levy antidumping duties on

imported goods that have been found to have been dumped (*i.e.,* sold in the United States at

prices below the producer's cost of production or sales price in the country of origin) or may

levy countervailing duties on imported goods that have been found to have been produced by

foreign manufacturers receiving unfair subsidies. 19 U.S.C. §§ 1671, 1673.  Antidumping

duties are imposed to counter the unfair trade practice of dumping.  Countervailing duties are

imposed to counter unfair foreign government subsidies to industries.  Both are meant to

level the playing field for domestic manufacturers and protect them from these predatory and

unfair trade practices by eliminating the unfair pricing margin and, thus, compensating for

any unfair advantage gained by foreign manufacturers.

22. Antidumping and countervailing duties are levied when the U.S. International Trade

Commission (ITC) determines that a U.S. domestic industry is being materially injured and

Commerce determines that imports are being dumped in the United States or are benefiting

from unfair subsidies.  Commerce sets an *ad valorem* duty rate which is multiplied by the

value of the merchandise entering the United States (the "entered value") to determine the

amount of antidumping or countervailing duties owed.   19 CFR § 351.212(b).  For example,

if a duty rate is 30 percent, the duty owed on merchandise valued at $100, would be 30 percent of $100, or $30.

23. When imposing antidumping or countervailing duties, Commerce issues a duty order that describes the merchandise subject to the additional duties (*i.e.,* the "scope of the order") in descriptive terms, which govern and specify the type of merchandise and the country of origin of that merchandise.

24. All invoices of imported merchandise must contain a detailed and accurate description of the merchandise, including the commercial name by which each item is known, the grade or quality, and the marks, numbers, or symbols under which sold by the seller or manufacturer in the country of exportation, together with the marks and numbers of the packages in which the merchandise is packed.  The description of the goods should be sufficient for the proper classification of the goods for tariff classification purposes.  19 U.S.C. § 1481(a).

25. Within 48 hours prior to loading foreign goods on a marine vessel for exportation to the United States, an Importer Security Filing (hereinafter "ISF") is required to be filed by the ISF Importer declaring, among other data, the Importer of Record Number, Buyer, "Ship To" Party, Consignee Number, and tariff classification code.  19 CFR Parts 4, 12, 18, 101, 103, 113, 122, 123, 141, 143, 149, 178, and 192.  *See* 73 Fed. Reg. 71,730 (Nov. 25, 2008).

26. Upon arrival or in advance of the arrival of imported merchandise into the United States, an importer of record or a licensed customs broker acting as the importer's agent may submit to Customs a Customs Form 3461, also known as an "Entry/Immediate Delivery."  The Form 3461 requires the importer to declare various data respecting the imported goods.  In particular, the form requires selection and disclosure of the:

a. Entry Type Code [Field 3, which is used to disclose the presence of merchandise subject to an antidumping or countervailing duty case (Type 03), among other types of status],

b. Importer Number (Field 9),

c. Ultimate Consignee Name (Field 10, name of the party for whom the goods are intended),

d. Importer of Record Name (Field 11),

e. Description of Merchandise (Field 20),

f. Harmonized System Number (Field 24, which classifies the goods for Customs purposes),

g. Country of Origin (Field 25), and requires certification by the Importer of Record or its authorized agent.

27. Upon importation or within 10 business days of filing a Form 3461, an importer of record or a licensed customs broker acting as the importer's agent submits to Customs a Customs Form 7501, also known as an "Entry Summary." In particular, the Entry Summary requires the importer or its agent to select and disclose the following data:

a. Entry Type Code [Field 2, which is used to disclose the presence of merchandise subject to an antidumping or countervailing duty case (Type 03), among other types of status],

b. Country of Origin (Field 10),

c. Consignee Number (Field 22),

d. Importer Number (Field 23),

e. Ultimate Consignee Name and Address (Field 25),

f. Importer of Record Name and Address (Field 26),

g. Description of Merchandise (Field 28),

12

    h.   Harmonized Tariff Schedule of the United States (hereinafter "HTSUS") Number (Field 29.A., which classifies the goods for Customs purposes),

    i.   Applicable ADA/CVD (antidumping or countervailing duty) case number (Field 29.B.),

    j.   HTSUS Rate (Field 33.A.),

    k.   ADA/CVD Rate (Field 33.B.),

    l.   Applicable duty sums per line item (Field 34),

    m.  Total Duty (Field 37),

    n.   Total (of all duties, taxes, and fees) (Field 40), and

    o.   requires certification by the Importer of Record or its authorized agent (Field 41),

        19 U.S.C. § 1484(a)(2)(B).

28. Importers are required to maintain, and submit upon request, documentation supporting the statements made on the Entry Summary.  Such documentation includes a Commercial Invoice, a Packing List, a Country of Origin Certificate, and a Bill of Lading. 19 CFR Part 163.

29. The Commercial Invoice must identify the seller and the buyer, and describe the particular goods being imported, including their quantity, country of origin, and price.  19 CFR § 141.86.

30. Importers of record are required to use reasonable care in providing truthful information to Customs for use in assessing duties.  See 19 U.S.C. § 1484(a)(1)(B).

31. Guidance published by Customs in February 2004 poses a series of questions to help importers ensure that they are exercising reasonable care when declaring the amount of duties owed.  For example, one of the questions is, "*Have you taken measures or developed reliable procedures to check to see if your goods are subject to a Commerce Department*

*dumping or countervailing duty investigation or determination, and if so, have you complied or developed reliable procedures to ensure compliance with Customs reporting requirements upon entry (e.g., 19 C.F.R. § 141.61)?"* Customs, Reasonable Care (A Checklist for Compliance) 12 (2004) (Reasonable Care Guidance).

32. The Reasonable Care Guidance also poses questions to help importers ensure they are exercising reasonable care in providing an accurate description and correct tariff classification of imported goods. For instance, it asks whether the importer has established reliable procedures, consulted with an expert, and obtained a ruling from Customs. *Id.* at 10-11.

**B. Antidumping Duties on Wooden Bedroom Furniture from the PRC**

33. On October 31, 2003, the U.S. domestic producers of wooden bedroom furniture filed a petition with the Department of Commerce for an investigation into whether wooden bedroom furniture from the PRC were being dumped by Chinese manufacturers.

34. After the investigation and preliminary findings by the ITC and Commerce, Commerce issued preliminary antidumping duty orders establishing duties effective June 24, 2004, 69 Fed. Reg. 35,312 (June 24, 2004).

35. In November 2004, Commerce issued final orders confirming the imposition of antidumping duties on wooden bedroom furniture from the PRC. 69 Fed. Reg. 67,313 (Nov. 17, 2004). In December 2004, the ITC determined that the domestic furniture industry is materially injured by reason of imports of wooden bedroom furniture from China that Commerce determined are sold in the United States at less than fair value. 69 Fed. Reg. 77,779 (Dec. 28, 2004).

36. The scope of the antidumping order (subsequently amended) is set forth in the Federal

Register[1], and is generally stated as:

"The product covered by the order is wooden bedroom furniture. Wooden bedroom

furniture is generally, but not exclusively, designed, manufactured, and offered for sale

in coordinated groups, or bedrooms, in which all of the individual pieces are of

approximately the same style and approximately the same material and/or finish. The

subject merchandise is made substantially of wood products, including both solid wood

and also engineered wood products made from wood particles, fibers, or other wooden

materials such as plywood, oriented strand board, particle board, and fiberboard, with or

without wood veneers, wood overlays, or laminates, with or without non-wood

components or trim such as metal, marble, leather, glass, plastic, or other resins, and

whether or not assembled, completed, or finished.

The subject merchandise includes the following items: (1) wooden beds such as loft

beds, bunk beds, and other beds; (2) wooden headboards for beds (whether stand-alone

or attached to side rails), wooden footboards for beds, wooden side rails for beds, and

wooden canopies for beds; (3) night tables, night stands, dressers, commodes, bureaus,

mule chests, gentlemen's chests, bachelor's chests, lingerie chests, wardrobes, vanities,

chessers, chifforobes, and wardrobe-type cabinets; (4) dressers with framed glass

mirrors that are attached to, incorporated in, sit on, or hang over the dresser; (5) chests-

on-chests,[2] highboys,[3] lowboys,[4] chests of drawers,[5] chests,[6] door chests,[7] chiffoniers,[8]

---

[1] *See Wooden Bedroom Furniture from the People's Republic of China: Final Results of Changed Circumstances Review and Determination to Revoke Order in Part,* 74 Fed. Reg. 8,506 (Feb. 25, 2009).
[2] A chest-on-chest is typically a tall chest-of-drawers in two or more sections (or appearing to be in two or more sections), with one or two sections mounted (or appearing to be mounted) on a slightly larger chest; also known as a tallboy. *Id.* at 8,507.

hutches,[9] and armoires;[10] (6) desks, computer stands, filing cabinets, book cases, or writing tables that are attached to or incorporated in the subject merchandise; and (7) other bedroom furniture consistent with the above list.

The scope of the order excludes the following items: (1) seats, chairs, benches, couches, sofas, sofa beds, stools, and other seating furniture; (2) mattresses, mattress supports (including box springs), infant cribs, water beds, and futon frames; (3) office furniture, such as desks, stand-up desks, computer cabinets, filing cabinets, credenzas, and bookcases; (4) dining room or kitchen furniture such as dining tables, chairs, servers, sideboards, buffets, corner cabinets, china cabinets, and china hutches; (5) other non-bedroom furniture, such as television cabinets, cocktail tables, end tables, occasional

---

[3] A highboy is typically a tall chest of drawers usually composed of a base and a top section with drawers, and supported on four legs or a small chest (often 15 inches or more in height). *Id.*

[4] A lowboy is typically a short chest of drawers, not more than four feet high, normally set on short legs. *Id.*

[5] A chest of drawers is typically a case containing drawers for storing clothing. *Id.*

[6] A chest is typically a case piece taller than it is wide featuring a series of drawers and with or without one or more doors for storing clothing. The piece can either include drawers or be designed as a large box incorporating a lid. *Id.*

[7] A door chest is typically a chest with hinged doors to store clothing, whether or not containing drawers. The piece may also include shelves for televisions and other entertainment electronics. *Id.*

[8] A chiffonier is typically a tall and narrow chest of drawers normally used for storing undergarments and lingerie, often with mirror(s) attached. *Id.*

[9] A hutch is typically an open case of furniture with shelves that typically sits on another piece of furniture and provides storage for clothes. *Id.*

[10] An armoire is typically a tall cabinet or wardrobe (typically 50 inches or taller), with doors, and with one or more drawers (either exterior below or above the doors or interior behind the doors), shelves, and/or garment rods or other apparatus for storing clothes. Bedroom armoires may also be used to hold television receivers and/or other audio-visual entertainment systems. *Id.*

tables, wall systems, book cases, and entertainment systems; (6) bedroom furniture made primarily of wicker, cane, osier, bamboo or rattan; (7) side rails for beds made of metal if sold separately from the headboard and footboard; (8) bedroom furniture in which bentwood parts predominate; (9) jewelry armoires; (10) cheval mirrors; (11) certain metal parts;[11] (12) mirrors that do not attach to, incorporate in, sit on, or hang over a dresser if they are not designed and marketed to be sold in conjunction with a dresser as part of a dresser-mirror set; (13) upholstered beds; [14] and (14) toy boxes. [15]. Imports of subject merchandise are classified under subheading 9403.50.9040 of the HTSUS as "wooden . . . beds" and under subheading 9403.50.9080 of the HTSUS as "other . . . wooden furniture of a kind used in the bedroom." In addition, wooden headboards for beds, wooden footboards for beds, wooden side rails for beds, and wooden canopies for beds may also be entered under subheading 9403.50.9040 of the HTSUS as "parts of wood" and framed glass mirrors may also be entered under subheading 7009.92.5000 of the HTSUS as "glass mirrors . . . framed." This order covers all wooden bedroom furniture meeting the above description, regardless of tariff classification. Although the HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive."

37. Commerce assigns a case number to each investigation into whether antidumping duties or countervailing duties should be imposed. When such duties are owed, importers must

---

[11] Metal furniture parts and unfinished furniture parts made of wood products (as defined above) that are not otherwise specifically named in this scope (i.e., wooden headboards for beds, wooden footboards for beds, wooden side rails for beds, and wooden canopies for beds) and that do not possess the essential character of wooden bedroom furniture in an unassembled, incomplete, or unfinished form. Such parts are usually classified under the Harmonized Tariff Schedule of the United States ("HTSUS") subheading 9403.90.7000. *Id.*

identify the applicable case number on the Entry/Immediate Delivery (Customs Form 3461) and Entry Summary (Customs Form 7501).  Case A-570-890 relates to antidumping duties on wooden bedroom furniture from the PRC.  69 Fed. Reg. 67,313 (Nov. 17, 2004).

38. Currently and during the time period at issue, Ecologic sourced its dormitory bedroom furniture from Zhejiang Jinhua Friendship Industry Company Limited and Xiamen Wellyea Furniture Company Limited in the PRC.

39. The antidumping duty rate for wooden bedroom furniture manufactured by Zhejiang Jinhua Friendship Industry Company Limited and Xiamen Wellyea Furniture Company Limited in the PRC was 216.01 percent for the time period at issue and currently.

**C. Defendants' Scheme to Evade Customs Duties**

40. Defendant Ecologic is in the business of selling bedroom and dormitory furniture in the United States.

41. Defendant Ecologic established and maintains a website (www.ecologicfurniture.com) depicting various bedroom and dormitory furniture sets, individual pieces, and assorted accessories, which it offers for sale.

42. Defendant Ecologic has bid and will bid on contract opportunities to provide bedroom and dormitory furniture in connection with dormitory and student housing projects.

43. Defendant Ecologic has submitted and will submit bids drawing on its existing bedroom and dormitory furniture sets, individual pieces, and assorted accessories.

44. Defendant Ecologic has submitted and will submit bids meeting customer specifications involving custom-designed bedroom and dormitory furniture sets, individual pieces, and assorted accessories, or involving custom adaptations of its existing bedroom and dormitory furniture sets, individual pieces, and assorted accessories.

18

45. From January 2010 to December 2012, Relator served as actual or nominal President and or Director of Defendant Bon Source.

46. In early 2011, Relator first met Mr. Goldman and Mr. Klein when Ecologic hired Bon Source to provide foreign sourcing and supply chain management services to procure wooden bedroom furniture from the PRC.

47. It is Relator's understanding that prior to hiring Bon Source, Ecologic imported wooden bedroom furniture from Malaysian manufacturers, exclusively.

48. In March or April 2011, Relator accompanied Mr. Goldman and Mr. Klein to the PRC to identify Chinese wooden bedroom furniture manufacturers for future sourcing.

49. While visiting Zhejiang Jinhua Friendship Industry Company Limited ("Jinhua") and Xiamen Wellyea Furniture Company Limited ("Wellyea") in the PRC, Mr. Goldman, Mr. Klein, and Relator observed factory workers mislabeling wooden bedroom furniture. The Chinese factory executives noted that its clients (U.S. furniture importers and Ecologic competitors) ordered the factory to mislabel the furniture items to knowingly evade the U.S. antidumping order on wooden bedroom furniture.

50. On their return to the U.S. (approximately a month later), Relator arranged at least two conference calls between Mr. Goldman, Mr. Klein and Mr. Shadley of R.L. Swearer, to discuss their trip to the PRC. R.L. Swearer provided customs brokerage and freight forwarding services to Relator's other clients at Bon Source.

51. Mr. Goldman and Mr. Klein asked Mr. Shadley if it was "legal" for Bon Source, which was not in the dormitory bedroom furniture business, to import wooden bedroom furniture as office furniture.

52. Mr. Shadley replied that he thought there was no real issue with Bon Source purchasing "office furniture" and using the misdescriptions as long as "it was not solely used for deception."

53. Mr. Shadley mentioned that the probability of Customs flagging any "office furniture" from the PRC were relatively low if classified under the HTSUS as such.  For example, classifying a wooden dresser drawer as a file cabinet, a type of office furniture so as to evade anti-dumping duties.

54. During these conference calls with Mr. Shadley, Relator summarized Mr. Shadley's comments by noting that importing under Bon Source/Omni would likely evade Customs' detection but is "severely into the very dark gray or even outright deceitful."

55. Relator advised Mr. Goldman and Mr. Klein against this practice and expressed his concern that if discovered, substantial fines could be possible.

56. Relator reminded Mr. Goldman and Mr. Klein that Bon Source's (and later Omni's) standard procedure is to not recommend any actions that were not strictly legal and that it would not pay any additional duties, fees, or penalties if assessed.  However, at the time Relator did not view the conduct itself as illegal or improper.  In his trip to the PRC, Relator observed that it appeared other U.S. furniture importers were engaged in a similar practice.  Ultimately, Relator presented these facts to Ecologic and Mr. Goldman planned and initiated the final decision to misdescribe subject wooden bedroom furniture.

57. Mr. Goldman informed Relator that Bon Source (and later Omni SCM LLC) would serve as the Importer of Record to cloak the identity of Ecologic, the true importer with all the financial interest in the imported merchandise.

58. Mr. Goldman and Mr. Klein designated Relator as the middle man between Ecologic and the Chinese furniture manufacturers.  Essentially, the Relator's role in the scheme was simply "running the paper" and expediting the logistics of shipment as well as identifying new foreign sourcing.

59. After additional discussion amongst Ecologic's Mr. Goldman, and Mr. Klein, Jinhua and Chinese factory executives, Mr. Shadley and Relator at Bon Source, the parallel invoicing scheme was created as follows:

    a. Ecologic issued a purchase order to Relator which accurately describes the wooden bedroom furniture items.  The furniture items described are identical to Ecologic's advertised furniture items on their website at www.ecologicfurniture.com.

    b. Relator, acting as a middle man, forwarded the Ecologic purchase order (unmodified) to the Chinese factories for production.  Bon Source/Omni handled all factory communications for Ecologic.

    c. Relator and his local Chinese staff simply relayed instructions from Ecologic to the factories, acting as Ecologic's third party office.

    d. The Chinese factories issued a pro forma invoice to Relator with identical images, quantity and value but different item description.  Each pro forma invoice listed Ecologic as the buyer and a different invoice number.

    e. Relator created a Bon Source (and later Omni) Worksheet which copied in its entirety the Chinese pro forma invoice with the misdescriptions and detailing Bon Source/Omni's sourcing fee.  Bon Source/Omni (via the accountant) sends an email to Ecologic with the Chinese pro forma invoice and Bon Source worksheet for verification.

    f. Relator has a copy of every Bon Source/Omni worksheet for Ecologic orders.

g. The Chinese factories sent a Commercial Invoice to R.L. Swearer, the customs brokerage firm, for customs entry paperwork. The Commercial Invoice listed Bon Source/Omni as the Importer of Record and buyer. Additionally, the Commercial Invoice contained the incorrect wooden bedroom furniture descriptions from the pro forma invoice.

h. R.L. Swearer intentionally misclassifies the furniture items to evade the scope of the wooden bedroom furniture antidumping order. Additionally, R.L. Swearer provided or omitted providing certain responses derived or derivable from the import documentation.

60. At no point did Relator have a financial interest in the imported wooden bedroom furniture from the PRC. Relator forwarded the Ecologic purchase orders to the Jinhua and Wellyea factories which in turn replied back to Relator with the misdescribed pro forma invoices.

61. Relator then forwarded to Ecologic the Jinhua and Wellyea pro forma invoices with different descriptions but identical in every sense with the Ecologic purchase order.

62. Mr. Goldman and Ecologic utilized Bon Source/Omni as the Importer of Record, using Relator's home address, to distance Ecologic from the import transactions in order to avoid Customs detection. This was the extent of Relator's involvement in the Defendants scheme to evade antidumping duties and other customs duties.

63. In the summer and fall of 2011, Mr. Goldman and Mr. Klein (without Relator) visited the Chinese factories multiple times. The first Ecologic orders were placed with the Chinese factories in December 2011

64. Defendant Goldman has directed and/or does direct Defendant Ecologic, by and through Defendant employees Ken Klein, Andrew Holley, Ron Johnson, and others, and by and through Defendants Bon Source and Omni to knowingly:

a. solicit quotes from and issue purchase orders to factories in PRC for the production of new merchandise for maintaining its own inventory or for fulfilling orders from its domestic customers, which knowingly misrepresent Defendants Bon Source or Omni as the buyer or vendor; and,

b. instruct or specify to foreign producers respecting the materials, appearance, design specifications, *etc.,* necessary and appropriate for production of its bedroom and dormitory furniture sets, individual pieces, and assorted accessories; and,

c. solicit or otherwise request or arrange for *Pro Forma Invoices* from foreign furniture suppliers in PRC (but not producers outside of PRC) respecting the design, production, packing, and delivery of its bedroom and dormitory furniture sets, individual pieces, and assorted accessories and caused(or causing) them to be issued knowingly misrepresenting the buyer to be Defendants Bon Source or Omni; and,

d. solicit or otherwise knowingly request or arrange for *Commercial Invoices* and *Packing Lists* from foreign suppliers in PRC (but not producers outside of PRC), which document the sale of Ecologic's bedroom and dormitory furniture sets, individual pieces, and assorted accessories and which knowingly misrepresent the buyer to be Defendants Bon Source or Omni; and,

e. instruct or otherwise request or arrange for foreign producers of furniture in PRC (but not producers outside of PRC) to use descriptions calculated to misrepresent imported goods

as metal articles, as office furniture, and/or as other articles not subject to antidumping duties or countervailing duties; and,

f.   instruct foreign producers of furniture in PRC (but not producers outside of PRC) to avoid using descriptions which might reveal the imported goods as, or suggest that the imported goods might be, wooden bedroom furniture or other articles subject to antidumping duties or countervailing duties; and,

g.   instruct foreign producers of furniture in PRC to organize the descriptions of imported articles so that they are described at an individual article level to mask the character of such articles designed, known, and intended to be components of wooden bedroom furniture sets; and,

h.   deliver or otherwise arrange for or permit delivery of *Commercial Invoices, Packing Lists,* and other knowingly false or misleading documents used to make entry into the United States to Defendants R.L. Swearer and Richard Shadley, which misrepresent the true character of the imported goods, whether by misdescription, by omitted information, by segregation, or other artifices, for their use by Defendants R.L. Swearer and Richard Shadley in transacting customs business with those documents, including preparing and filing an ISF, Forms 3461 and 7501, thus avoiding timely payment or deposit of applicable duties and depriving the United States of revenue by allowing entry transactions to liquidate and become final; and,

i.   arrange for and allow and Defendants R.L. Swearer and Richard Shadley to prepare and file ISF containing false representations respecting the Importer of Record Number, Buyer, "Ship To" Party, Consignee Number, and/or tariff classification code.  19 CFR Parts 4, 12, 18, 101, 103, 113, 122, 123, 141, 143, 149, 178, and 192.  *See* 73 FR 71730.

j.  arrange for and allow the submission of a Customs Form 3461 providing one or more

instances of false data, as follows:

i.  Field 3 provides response of "01," instead of "03," thus concealing that the entry

includes merchandise subject to an antidumping or countervailing duty Order; and,

ii.  Field 9 misrepresents that a party lacking the right to make entry in the circumstances,

is the Importer of Record; and,

iii.  Field 10 misrepresents the party for whom the goods are intended; and,

iv.  Field 11 misrepresents that a party lacking the right to make entry in the

circumstances, is the Importer of Record; and,

v.  Field 20 includes knowing descriptive misrepresentations and/or descriptive omissions

calculated to conceal the that the imported merchandise includes wooden bedroom

furniture; and,

vi.  Field 24, a data element selected by Defendants R.L. Swearer and Richard Shadley,

misclassifies the goods under the HTSUS in a manner calculated to conceal the that

the imported merchandise includes wooden bedroom furniture.

k.  Arrange for and allow the submission of a Customs Form 7501 providing one or more

instances of false, misrepresented, and/or insufficient data, as follows:

i.  Field 2 provides response of "01," instead of "03," thus concealing that the entry

includes merchandise subject to an antidumping or countervailing duty Order; and,

ii.  Field 22 misrepresents the party for whom the goods are intended; and,

iii.  Field 23 misrepresents that a party lacking the right to make entry, in the

circumstances, is the Importer of Record; and,

iv.  Field 25 misrepresents the party for whom the goods are intended; and,

    v.   Field 26 misrepresents that a party lacking the right to make entry, in the circumstances, is the Importer of Record; and,

    vi.   Field 28 includes knowing descriptive misrepresentations and/or descriptive omissions calculated to conceal the that the imported merchandise includes wooden bedroom furniture; and,

    vii.   Field 29.A., a data element selected by Defendants R.L. Swearer and Richard Shadley, misclassifies the goods under the HTSUS in a manner calculated to conceal that the imported merchandise includes wooden bedroom furniture; and,

    viii.   Field 29.B. omits references to applicable ADA/CVD (antidumping or countervailing duty) case numbers; and,

    ix.   Field 33.B. omits disclosing an applicable Rate; and,

    x.   Field 34 omits applicable ADA/CVD duties; and,

    xi.   Field 37 sums total duties but omits applicable ADA/CVD duties; and,

    xii.   Field 40 sums total duties and other charges but omits applicable ADA/CVD duties.

65. As a result of the knowing acts above, Defendants caused the importation of wooden bedroom furniture from PRC into the U.S., for consumption, without disclosing that it was or might be subject to the AD Order Case No. A-570-890.

66. But for the knowing acts above, the subject importations of wooden bedroom furniture from PRC would have been subject to payment of antidumping duties equal to 216.01 percent of the customs value.

67. As a result of the knowing acts above, Defendants Bon Source and Omni evaded payment of antidumping duties specified by the AD Order Case No. A-570-890 respecting subject importations of wooden bedroom furniture from PRC into the U.S.

## IV.   VIOLATIONS

**A.   Count 1: Violation of the False Claims Act (31 U.S.C. § 3729(a)(1)(G) (2009))**

68. Relator re-alleges and incorporates the allegations of paragraphs 1 through 67 as though fully set forth herein.

69. In violation of 31 U.S.C. § 3729(a)(1)(G) (2009), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States Government.

70. By means of these false statements, Defendants decreased the amount of customs duties they paid on imports of wooden bedroom furniture in an amount to be determined at trial.

**B.   Count 2: Conspiracy to Violate False Claims Act (31 U.S.C. § 3729(a)(1)(C) (2009))**

71. Relator re-alleges and incorporates the allegations of paragraphs 1 through 70 as though fully set forth herein.

72. In violation of 31 U.S.C. § 3729(a)(1)(C) (2009), Defendants conspired to commit a violation of subparagraph (G) of 31 U.S.C. § 3729(a)(1) (2009).

73. Thus, Defendants conspired to knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States Government.

74. As a result of this conspiracy, the United States Government was damaged in an amount to be determined at trial.

**C.   Count 3: Unjust Enrichment**

75. Relator re-alleges and incorporates the allegations of paragraphs 1 through 74 as though fully set forth herein.

76. By reason of the conspiracy discussed hereinabove, Defendants avoided paying duties owed to the United States, or avoided paying prices for wooden bedroom furniture produced in the PRC and incorporating duties owed the United States, and were thereby unjustly enriched in the importation and subsequent sale of the goods in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Relator Matthew L. Bissanti, Jr., acting on behalf of and in the name of the United States, respectfully requests judgment be entered in the favor of the United States against the Defendants as follows:

(1) for damages in the maximum amount specified by 31 U.S.C. § 3729(a)(1) (2009); and,

(2) for the maximum amount of civil penalties specified by 31 U.S.C. § 3729(a)(1) (2009) be imposed for each and every reverse false claim that Defendants respecting a CBP Form 7501 Line Item presented to the United States and/or its grantees pursuant to 28 CFR § 8585.3(a)(9); and,

(3) for emergency injunctive relief and other appropriate orders (*i.e.,* search, detention, seizure, constructive seizure, *etc.*) respecting inbound, unlanded shipments, shipments in Customs' custody, and imported subject merchandise in the possession or constructive possession of Defendants or agents for Defendants; and,

(4) for all costs of this civil action; and,

(5) for reasonable attorneys' fees; and,

(6) for expenses Relator necessarily incurred in bringing and pursuing this case; and,

(7) for pre-judgment and post-judgment interest; and,

(5) for reasonable attorneys' fees; and,

(6) for expenses Relator necessarily incurred in bringing and pursuing this case; and,

(7) for pre-judgment and post-judment interest; and,

(8) for such other and further relief as this court deems proper, equitable, and just; and,

(9) for the maximum award amount allowable to Relator, Matthew L. Bissanti, Jr.

## DEMAND FOR JURY TRIAL

The Relator, Matthew L. Bissanti, Jr., on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Respectfully submitted,

DATED: May 23, 2014        /s/ _____

Wendell A. Odom, Jr.
Texas Bar Number: 15208500
The Law Offices of Odom & Davis
Attorneys for Relator
440 Louisiana, Suite 200,
Houston, TX 77002
Telephone: 713-223-5575
wendellodom@aol.com

/s/ _____

Scott L. Johnston, (Pending Admittance *Pro Hac Vice*)
Texas Bar Number: 00787785
Givens & Johnston, PLLC
Attorneys for Relator
950 Echo Lane, Suite 360,
Houston, TX 77024
Telephone: 713-932-1540
sjohnston@givensjohnston.com

## CERTIFICATE OF SERVICE

I hereby certify that this COMPLAINT: FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) has been served via FedEx to:

Eric H. Holder, Jr., United States Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Susan Strawn, Assistant United States Attorney
The United States Attorney's Office for the Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216

This the __23__ day of May, 2014.

s/ _____
Wendell A. Odom, Jr.
Texas Bar Number: 15208500
The Law Offices of Odom & Davis
Attorneys for Relator
440 Louisiana, Suite 200,
Houston, TX 77002
Telephone: 713-223-5575
wendellodom@aol.com

/s/ _____
Scott L. Johnston (Pending Admittance *Pro Hac Vice*)
Texas Bar Number: 00787785
Givens & Johnston, PLLC
Attorneys for Relator
950 Echo Lane, Suite 360,
Houston, TX 77024
Telephone: 713-932-1540
sjohnston@givensjohnston.com